UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

UNITED STATES OF AMERICA        :
                                            :

           -   v.   -                :         18 Cr. 154 (KMK)
                                            :

MITCHELL KLEIN            :
                                            :

               Defendant.              :
                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**SENTENCING MEMORANDUM
ON BEHALF OF MITCHELL KLEIN**

 

PETRILLO KLEIN & BOXER LLP

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391

*Attorneys for Mitchell Klein*

Dated:  June 11, 2018

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

I.      A NON-CUSTODIAL SENTENCE IS WARRANTED
        UNDER 18 U.S.C. § 3553(a)......................................................................... 3

        A.      Applicable Legal Standards ............................................................... 3

        B.      Mitch's Personal Family History and Characteristics ........................... 4

        C.      Mitch's Professional History .............................................................. 10

                1.      Mitch's Well Earned Reputation as a Trusted Accountant and Tax
                        Preparer ................................................................................ 10

                2.      FKF3 ..................................................................................... 11

                3.      Klein Family Investments in FKF3........................................... 11

        D.      Offense Conduct ............................................................................. 13

        E.      Neither the Nature of the Offense nor the Seriousness of the Offense
                Warrant a Custodial Sentence ........................................................... 13

        F.      A Sentence of Probation Would be Consistent With the Goal of Avoiding
                Unwarranted Sentencing Disparities................................................... 18

        F.      Deterrence Will Not Be Materially Promoted by a Custodial Sentence.............. 20

II.     REQUEST FOR SENTENCE OF PROBATION ........................................... 21

III.    OBJECTIONS TO PSR .............................................................................. 21

        A.      The PSR's Presentation of "Offense Conduct" Contains Content That is
                Neither "Offense Conduct" nor "Relevant Conduct" ........................... 22

        B.      The PSR Erroneously States That Mandatory Restitution Applies to the
                Offense of Conviction...................................................................... 24

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page**

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................... 4

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................................ 4

*Nelson v. United States*, 555 U.S. 350 (2009) ............................................................. 4

*Pepper v. United States*, 562 U.S. 476 (2011) ............................................................ 3

*United States v. Anderson*, 15 F.3d 979 (10th Cir. 1994) ........................................... 23

*United States v. Booker*, 543 U.S. 220 (2005) ........................................................... 3

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) .............................. 3

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ............................................. 3-4

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ...................................... 21

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) .................................................. 14

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .................................................. 3

*United States v. Marsh*, 820 F. Supp. 2d 320 (E.D.N.Y. 2011) .................................. 14

*United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006) ................................... 4

*United States v. Olis*, 2006 WL 2716048, 03 Cr. 217 (SL)
(S.D. Tex. Sept. 22, 2006) ......................................................................................... 20

*United States v. Ruiz*, 04 Cr. 1146 (RWS), 2006 WL 1311982
(S.D.N.Y. May 10, 2006) ........................................................................................... 20

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .......................................... 19, 21

**Statutes**

18 U.S.C. § 4 ................................................................................................................ 1

18 U.S.C. § 3553 .......................................................................................... 2, 3, 4, 14, 19

18 U.S.C. § 3663A .......................................................................................... 25

**Other Authorities**

Government's Sentencing Memorandum, (Dkt. No. 11),
   *United States v. Dorfman*, 16 Cr. 606 (CS) (S.D.N.Y. ........................................................... 17

Sentencing Hearing Transcript,
   *United States v. Dorfman*, 16 Cr. 606 (CS) (S.D.N.Y.) ........................................................... 18

We respectfully submit this Memorandum on behalf of our client, Mitchell Klein ("Mitch"), in connection with the sentencing proceeding scheduled for June 26, 2018.   On March 13, 2018, this Court accepted Mitch's plea of guilty to an Information charging him in one count with misprision of felony, in violation of 18 U.S.C. § 4.

## INTRODUCTION

Mitch entered a plea of guilty to failing to report and concealing a theft by one of his former partners in a real estate lending business called FKF3, LLC.  The Offense Conduct occurred almost nine years ago.  Since the time of Mitch's failure to report his former partner's offense, he has lived productively and admirably.  He has continued to serve clients as a CPA and tax preparer, including clients who lost money in the FKF3 venture but whose trust in him continues.  As he has for decades, Mitch has also continuously offered free tax services to numerous nonprofit organizations.  Mitch plays a very active role in the lives of his spouse, his children, his grandchildren (all born after the Offense Conduct) and his extended family.  The family has more than its share of health, economic and life challenges, and Mitch is by all accounts the family's "rock" – ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

accompanying his mother-in-law to medical treatment; and guiding and encouraging friends and family as they endure life setbacks.  As the letters in support of Mitch that we submit with this submission attest,[1] Mitch is a good, humble man, with a heart of gold.

In this context, we respectfully ask that the Court impose a noncustodial sentence, which, respectfully, would be "sufficient, but not greater than necessary to comply with the purposes set

---

[1]      The letters submitted with this Memorandum are cited "Ex. ___ (author's name)."

forth" in the sentencing statute (as listed in 18 U.S.C. § 3553(a)(2)).  The government does not claim Mitch has done anything wrong since 2009.  And, his life during the past nine years provides the unassailable proof who Mitch is today.

Importantly, Mitch has suffered $40 million-plus of default judgments (taken during the government's six-year criminal investigation, which limited his ability to defend himself), and court-ordered garnishment, and yet, has never, since the day he met undersigned counsel in September 2011, expressed anything but regret and an abiding wish to pay FKF3 noteholders such money as he is able.  He too invested and reinvested in FKF3 – losing it all – and he kept putting money in even after it was clear that he would, realistically, never see any return on his contributions.

None of this is to say that Mitch (and his partners) did not make bad decisions – significant ones – nine and more years ago.   Nor is Mitch now pointing at others, such as his lawyer partner, who has pleaded guilty to lying to the Department of Labor, and his partner John Magee, who recently went to trial in a case brought by the FKF3 Bankruptcy Trustee in which Mitch testified and suffered an adverse jury judgment of more than $20 million.  But, it is respectfully submitted that (1) the lengthy passage of time since the offense – a period in which children have started and finished college, married and had children, and gained (and lost) employment; (2) the facts of Mitch's life now, including the burdens he shoulders for a family with real needs; (3) his post-plea cooperation with the Bankruptcy Trustee, see below; and (4) the nature of the offense charged, all strongly combine to support a noncustodial sentence. Probation agrees.   *See* Presentence Report ("PSR"), at 20 ("We respectfully recommend that

Your Honor impose a sentence of Time Served (1 day),[2] followed by a one-year term of supervised release.").

Such a sentence would serve all of the relevant purposes of sentencing in the circumstance presented and, importantly, allow Mitch, who has accepted responsibility for his conduct and is determined to continue to conduct himself honorably and lawfully, to pay restitution, to which he agreed voluntarily, and to continue both to provide for his family and care for his wife, and make significant contributions to the community.

## I.   A NON-CUSTODIAL SENTENCE IS WELL WARRANTED UNDER 18 U.S.C. § 3553(a)

### A.   Applicable Legal Standards

Following *United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). Although the Guidelines are to be given "fair consideration" "before imposing" a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotations and citations omitted). Concerning this individualized assessment, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be

---

[2]     The day of the defendant's arrest or surrender is a day "in custody." Thus, in cases where the defendant is not subject to pre-trial detention, a sentence of time-served or one day of imprisonment refers to the period prior to the defendant's presentment and release on bail.

*presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

Section § 3553(a) mandates that the sentence be "sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)." *Dorvee*, 616 F.3d at 182; *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Those purposes are: (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of sentencing, described in § 3553(a)(2) to include (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from future criminal conduct by the defendant; and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines and their policy statements; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution. 18 U.S.C. § 3553(a). As discussed below, based on these factors, a non-custodial sentence is well warranted in this case. *See* PSR at 20.

### B.     Mitch's Personal Family History and Characteristics

Mitch was born in 1955 to Stanley and Elayne Klein, and has two sisters, Rhonda and Beth. Mitch's father and mother worked together at a printing company in the Bronx founded by

his father.   Mitch was the "responsible" and "reliable" child, Ex. 8 (Beth Blecker), who "would never do anything wrong." Ex. 9 (Rhonda Conte), and "never" "got into the occasional trouble." Ex. 6 (Elayne Klein).  He earned an Associate's Degree from Rockland Community College in 1976, and a "Bachelor of Business Administration degree in public accounting" from Hofstra University in 1978.  PSR ¶¶ 53-54.

During his freshman year at Rockland Community College, Mitch met Laurette Mason, who would become his "soul mate" and "best friend" for the next 37-plus years.  Ex. 2 (Laurette Klein); *see also* Ex. 1 (Mitch) (describing Laurette as the "love of [his] life").  Together, they have built a "very close-knit family," *id.*; *see also* Ex. 13 (Rabbi Leiken) ("This is a unique and large family that spends almost every holiday together and attends one another's life-cycle events without fail. They are supportive of one another in moving ways and demonstrate the kind of love and kindness that our world needs more of."), and today have three adult children, Jason, Jenna, and Tracy, and four grandchildren.  The family's foundation is the strong bond between Mitch and Laurette.  Ex. 6 (Elayne Klein) ("Out of all my children they have the type of marriage that I had with my husband of 66 years, best friends and soul-mates."); Ex. 10 (Beth Heinle) ("He and my sister have a fairy-tale marriage that I always envied. They are each other's best friends and are always involved with family."); Ex. 7 (Theodora Mason) ("Over the years Mitch has been a loving husband for my daughter."); Ex. 26 (Steven Portnoy) ("He married his high school sweetheart and true soulmate whom he has always treated as his teammate in life.").

Mitch and Laurette have not been without hardships and setbacks.  ███████████████

████████████████████████████████████████████████

████████████████████████████████ █ ██████████████████

---

3 ████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ Thankfully, ████████████████████████████████████

██████████████████████████████████████ and the stress of the

multi-year investigation in this matter have made Mitch and Laurette's marriage even stronger.

Ex. 2 (Laurette Klein) ("The saying 'what doesn't kill us makes us stronger' is true. I have never

loved or believed in anyone more than my husband.").

Mitch has also earned the admiration and love of his three children.  *See* Ex. 4 (Jenna

Robitaille ("My dad, Mitchell Klein, is my hero."); Ex. 5 (Tracy Klein) (describing her father as

her "idol, role-model, and rock").  His daughters, Jenna and Tracy, both recount how deeply

involved Mitch was in their respective childhoods despite the pressures of building an

accounting practice to support his family.  As Jenna writes:

> Growing up my dad was always there for me. He never wanted to be on the sidelines
> during my life, so he became the coach for my soccer and softball leagues. He mentored,
> encouraged, and cheered. It did not stop with sports, that spirit extended towards
> everything my dad did for me. It was visible when he helped me in school, taught me

how to drive a car, prepared me to interview and land my first job, showed me what true love in a partner looks like, and taught by example how to be an amazing parent.").

Ex. 4.

Tracy writes similarly:

He taught me how to play sports, ride a bike, drive a car, and just be an all-around kind and friendly person. To this day he still helps me by donating his time to the Boarding School where I work to help me coach the girls' varsity tennis team. He taught me the importance of family, for which I am grateful to have. He taught me how important it is to be an honest, hard-working, and caring person. He instilled in me and my siblings a strong work ethic and morals. He taught us to always try our hardest and to never give up. As well as, to treat everyone the way you would want to be treated. My dad enabled me to build and foster a strong foundation to not only survive but to thrive in this world. I would not be the person I am today without him."

Ex. 5. Jason, Mitch's son, states that his father "means the world to" him, and describes him as

"the father/grandfather that [Jason] strive[s] to be."  Ex. 3 (Jason Klein).  Mitch's steadfast

support has seen Jason through a ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

Mitch's selflessness extends beyond his nuclear family. Daniel Abramson describes how Mitch and Laurette lent money to a friend who was diagnosed with a rare disease and sought to participate in a clinical trial in Europe. Ex. 18 (Daniel Abramson). Beth Heinle, Mitch's sister in-law, describes how after her divorce, when she struggled financially, Mitch and Laurette sent her "money for groceries," and "put[] money aside" for Beth's daughter, Mitch's niece, to pay for college tuition. Ex. 10 (Beth Heinle); *see also* Ex. 2 (Laurette Klein) ("We put our niece through college since her mom was a single-mother working two jobs to make ends meet.").

Mitch likewise supported his sister Beth and her son Matthew "emotionally and financially" after Beth's divorce, and ██████████████████████████████████ ████████████████████████████████████████████████████████████████ And, when Mitch's uncle was in a tragic car accident, Mitch managed his uncle's delivery-service business for approximately six months, so the business could stay afloat while his uncle was hospitalized. Ex. 9 (Rhonda Conte) ("In the late 1980's our Aunt, Uncle, cousin, and cousin's daughter were in a devastating car accident. My cousin's daughter died instantly, our Uncle was in bad shape. Mitch was there to help our Uncle's business for approximately six months in the hope that he would recover and have a business to return to. Unfortunately, that did not happen. Our Uncle passed away but at least during those six months my Aunt was able to have income to live on. Mitch then voluntarily helped my Aunt learn how to handle her finances.").

Many others have benefited from Mitch's kindness and willingness to extend himself. *E.g.*, Ex. 17 (Carol Rost) ("My husband was in the hospital in serious condition and Mitch came and sat with us while we waited out the most critical stage of care. Mitch has been there for us in good times as well as difficult times."); Ex. 21 (Steven Medoff) (After his divorce, Medoff "moved in with Mitch and [Laurette] for a short period of time while [he] tried to find a place to

settle down," and Mitch "bec[a]me [the couple's] mediator to pick up and drop off [their] children" to "avoid . . . unnecessary [f]ights."); These recollections, and others, *e.g.*, Ex. 2 (Laurette Klein) ("Over the years we have helped pay for Mitch's grandmothers nursing home and medical bills when his parents were unable to."), reflect Mitch's fundamental character.

Mitch devotes considerable time and effort to charitable causes. He has provided free auditing services to several charitable organizations in the tristate area, including The Desmoid Tumor Research Foundation, *see* Ex. 26 (Steven Portnoy) ("Twelve years ago, when my wife started The Desmoid Tumor Research Foundation, Mitch was the first person offering to help, not only by donating money but also by handling part of the foundation's accounting. In those 12 years he has repeatedly refused to be compensated for his work, always asking what more he can do to help the organization."), the "Palisades Library, Emelin Theatre, Pelham Arts Center, Church of St. Barnabas, Parrish of Christ, Island Medical Center and the Clarkstown Soccer Club." *See* Ex. 13 (Rabbi Leiken). In 2006, Mitch also helped found an annual tennis tournament, the Kennedy Funding Invitational, which, over four years, helped raise more than $3 million for the Breast Care Centers at Englewood Hospital and Nyack Hospital. *See* Ex. 26 (Steven Portnoy) ("While spending untold hours planning and running the event, he remained in the background, never seeking any recognition for all of his efforts.").

Understandably, given his history of generosity and community involvement, Mitch has deep feelings of remorse about his offense conduct. *See* Ex. 1 (Mitch) ("Learning to live with the regrets of my action or inaction is the hardest of all. Since 2009 I have tried to remain the person I grew up trying to be. A giver to society. A caring, hard-working dependable human being that others can count on. Whether it be family, friends, or charitable organizations I pledge to be there now and in the future. I live with shame and agony each and every day."); *see also*

-9-

Ex. 2 (Laurette Klein) ("My husband and I have had many conversations over the past 9 years as to what happened . . . I do not think he will ever forgive himself for the pain and suffering his mistakes caused."); Ex. 3 (Jason Klein) ("To say the past several years have been rough on my father is an understatement.  I've watched my father, the strongest man I've ever known, cry because of his regret . . ."); Ex. 5 (Tracy Klein (stating that her father "feels tremendous remorse")).

      **C.**     **Mitch's Professional History**

             1.     Mitch's Well Earned Reputation as a Trusted Accountant and Tax <u>Preparer</u>

Mitch achieved his CPA license in 1982.  PSR ¶ 55.  He became a partner at Fasman, Klein & Feldstein CPAs in 1984, and in 2010, Mitch founded his own accounting firm, ML Klein & Company CPA's LLP ("ML Klein").  Laurette, who began her career in the medical technology field, has worked as Mitch's assistant at ML Klein since 2010.  Mitch also has a partner.

During his more than thirty years of practice, Mitch has earned the trust of his accounting clients.  *See* Ex. 18 (Daniel Abramson) ("Through the years he has always provided my business with immediate help when needed, timely tax filings that are always accurate, expert tax advice, and most importantly an honest caring sounding board to float ideas around regarding any business topic."); Ex. 14 (Arnold Garelick) ("I want you to know that Mitch is a hard-working man who always has provided me with quality, caring, and professional accounting services, and advise for my businesses and myself . . . I rely on Mitch and have the utmost confidence in his advice."); Ex. 15 (Herbert Mandel) ("During this time I have relied on Mitch for guidance, as well as for the typical accounting functions performed by his firm. His advice and counsel has been an invaluable asset to me personally and to the success of my firm, now in its fifty first year

of operation."); Ex. 22 (Howard Berkower) ("I have continued to observe Mitch as a professional from the other side of the table, as his client. He is a skilled, knowledgeable, smart, and committed professional. Mitch has continued to prepare my annual personal income tax returns for more than 20 years.").

Mitch also served as the president of the National Conference of CPA Practitioners, as a council member of the AICPA, on the board of the AICPA's Small Business Taxation Committee, and as president of the New City Chamber of Commerce.

### 2.   FKF3

Through his accounting practice, Mitch met Magee and Dorfman.  Together, they formed FKF3 in or around 2004, to provide financing for real estate projects in the tristate area using funds they loaned to FKF3 and money borrowed from third parties who would receive promissory notes.  Magee, a businessman, had significant real estate experience and would identify and manage FKF3's real estate investments.  Dorfman, an attorney, would provide legal services to FKF3.  And, Mitch, as the accountant, would manage FKF3's books and records. The business plan of the principals contemplated that FKF3's business proceeds (loan repayments) would fund interest payments to FKF3 noteholders, which included Mitch, his family, and certain clients of his accounting practice, with any available spread between the lending and borrowing rates reverting to the principals.

### 3.   Klein Family Investments in FKF3

Mitch and his family made substantial investments in FKF3.  In all, they lost more than $1.5 million when FKF3 filed for bankruptcy protection in July 2010.  At that time, Mitch was due $1,148,818.47, which constituted approximately 35% of Mitch and Laurette's net worth, Jason Klein was due $400,000, Tracy Klein was due $40,000, and Mitch's in-laws were due

$250,000.  Reflecting Mitch's belief in FKF's projects, more than one third of Mitch's ultimate balance due from FKF3 was invested in 2008 (more than $440,000) and 2009 (more than $100,000), during a period of substantial stress in the real estate market.[4]

Mitch also took steps to alleviate the liquidity pressures on FKF3 resulting from the financial crisis.  In contrast with his former partners, Mitch, beginning in April 2009, began voiding regular FKF3 interest payment checks to himself, instead recording such amounts as part of his note balance.  And, in 2010, within months of FKF3's bankruptcy filing, Mitch personally invested $170,000 in the Aventine Edgewater project, in the hope that the project could be completed and condominium units sold, thus generating sales proceeds to pay FKF3's noteholders.

Mitch profoundly regrets the losses suffered by FKF3 noteholders, and acknowledges that he and his partners made poor judgments in a number of their decisions.  At the same time, it is apparent that Mitch's financial interest was aligned with FKF3's noteholders, and that, when the financial crisis hit and related real estate market turmoil followed, he endeavored to preserve the venture's value as best he could.  Ex. 7 (Theodora Mason) ("My husband and I were involved in FKF3. Mitch felt awful when things started to decline and fall apart. I know he tried everything he could to keep it going.").

After pleading guilty in this matter, Mitch met with the FKF3 Trustee and his counsel to provide assistance in the Trustee's efforts to marshal assets for the benefit of FKF3's noteholder creditors.  Devoting considerable time and at his expense and waiving his right to self-incrimination concerning a number of subject matters, Mitch was deposed for four days and testified at trial for three days in *Gregory Messer, as Trustee of the FKF Trust v. John F. Magee,*

---

[4]       These figures represent injections of new money by Mitch in FKF3, and therefore do not include, *e.g.*, interest checks or distribution checks due Mitch that were voided.

*et al.*, 13 Civ. 3601 (JCM).  In early June, a jury adjudged Magee liable for more than $20 million.

### D.    Offense Conduct

The Cleary's were clients of Mitch's accounting practice.  Mitch acknowledges that his concealment from the Cleary family of Magee's misappropriation of a $500,000 cashier's check from FKF3 was a significant breach of trust.  His conduct has haunted Mitch for the past nine years.  Ex. 1 (Mitch) ("A feeling of depression (and dread comes over me each morning as I wake up and face the day) . . . Every time I am alone I am overwhelmed with thoughts of 'what if' or 'if only'. Whether it's in the shower or on a drive somewhere it is constantly on my mind. I could be with my wife and she might be telling a story and I realize I haven't heard a thing she was saying because I'm thinking about the mistakes I made. It hurts each and every day.").  In his plea agreement, Mitch voluntarily agreed to restitution (in a circumstance where restitution is not mandatory by statute), because he affirmatively wishes to repay the Cleary family. *Id.* ("The mistakes I made have hurt not just me, but others that relied on me and that makes it even harder to cope with. The Cleary's had been clients of mine for approximately twenty years.  Rich Cleary actually helped me with my son's Cub Scout derby car about twenty-five years ago.  I have incredible remorse which I know will remain throughout my lifetime.").

### E.    Neither the Nature of the Offense nor the Seriousness of the Offense Warrant a Custodial Sentence

A non-custodial sentence would be "sufficient, but not greater than necessary to comply with the specific purposes" of 18 U.S.C. § 3553(a).

First, the Offense Conduct is almost nine years old.  Mitch has no criminal history, and since the time of the offense, has been an upstanding, law-abiding, and contributing citizen.  See *United States v. Howe*, 543 F.3d 128, 132-133 (3d Cir. 2008) (affirming a non-custodial sentence

for two counts of wire fraud "despite an advisory Sentencing Guidelines range of 18 to 24 months' imprisonment," where the sentencing court viewed the crime as "an isolated mistake" in an otherwise "honorable and lawful life").

Second, were Mitch to be imprisoned, the collateral damage would be real and substantial.  Mitch is already at risk of losing his CPA license permanently, and is the "primary source of financial support for his family." PSR at 20. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ *See* supra at 7; *see e.g., United States v. Marsh*, 820 F. Supp. 2d 320, 379 (E.D.N.Y. 2011) (three-month sentence in fraud offense where guideline range was 121 to 151 months, noting that "the family will suffer financially during [defendant's] absence.").

A term of imprisonment would also impair Mitch's ability to make restitution to the Cleary family because the viability of Mitch's livelihood depends on uninterrupted client contact and interaction.

A non-custodial sentence would additionally take into account the length of the Government's investigation in this matter and the serious toll it has exacted on Mitch and his family.  The weight of the six-year investigation has caused immeasurable stress for Mitch and his family.  Ex. 1 (Mitch) ("Since 2009 stress is a daily feeling. It started with normal fear of the unknown. The day to day desire to hibernate at home afraid of meeting people, to be in the public."); Ex. 2 (Laurette Klein) ("The past 9 years have created a lot of stress in our lives."); Ex. 3 (Jason Klein) ("To say the past several years have been rough on my father is an understatement . . . I have watched him lose friends and clients and not be able to say anything to them about what was happening."); Ex. 5 (Tracy Klein) ("Our family is extremely close and if

one person suffers we all do. The past nine years has been very difficult for all of us. With this lasting for as long as it is, he still always looked on the positive side and tried to be strong for me. He let our father-daughter relationship come first but even with this I knew he was hurting, and through that, I was as well.").[5]

We expect that the Government will allege an aggravating circumstance by virtue of a footnote in Mitch's plea agreement in which Mitch agreed not to "contest" that (1) "he and others acting in concert with him made misrepresentations to certain FKF3 noteholders, namely, and in substance, that he and others acting at his direction represented that FKF3 had or would have first liens with respect to certain real estate projects to which FKF3 loaned money, even though the defendant knew that, with respect to such certain major loans, FKF3 did not have, or would not obtain, such liens," and (2) "that he personally represented that the money solicited from Victim-1 and Victim-2 would be used to finance real estate projects, even though he knew that the money would instead be used to pay interest payments to existing FKF3 creditors, and that those loans were safe and none of FKF3's projects were in trouble, even though the defendant knew that that representation was false." PSR ¶ 80.

The negotiated footnote and any inferences from it can only be viewed as a part of a mix of contrasting information, in what can be fairly described as a murky matter. Several FKF3 investors who lost substantial sums in FKF3 have written letters to the Court expressing their views as to this history as it relates to Mitch. Each remains a client of Mitch.

Arnold Garelick, writes as follows:

---

[5]    In view of the ongoing criminal investigation, Mitch, on advice of counsel, invoked his privilege against self-incrimination in the civil litigation that followed FKF3's bankruptcy. In 2012, the FKF3 Trustee obtained a default judgment against Mitch in the amount of $38,361,542.94. Furthermore, Mitch has been paying 10% of his wages to certain FKF3 creditors as a result of a default judgment entered against him in *Forest Mall, LLC et al v. FKF3, LLC, et al*, (Sup. Ct. Rockland Co.).

Mitch "remains my accountant today. I believe that says a lot considering I invested and lost approximately $5,600,000 in FKF3. My profession is real estate . . . At 71 years old I have experienced the ups and downs of real estate, so I understood the risks in investing. Never did I expect the devastation that occurred in 2009 to be as great as it was. I knew FKF had lent substantial money into One Madison Park and l also lent money individually to that project. When the project went bankrupt I knew FKF would soon follow . . . I want you to know that Mitch is a hard-working man who always has provided me with quality, caring, and professional accounting services, and advise for my businesses and myself . . .  I rely on Mitch and have the utmost confidence in his advice.

Ex. 14 (Arnold Garelick).

Herbert Mandel writes:  "Although I sustained a $600,000.00 loss I never doubted Mitch's integrity or sincerity in recommending that I invest. As you may gather, from the fact that he is still my accountant, I could not hold him responsible for the downturn of the real estate market which led to that loss."  Ex. 15 (Herbert Mandel).

And, Roger Plotkin, writes: "There is nothing that Mitch has done that has made me doubt his honesty, his sincerity, his openness and above all his remorse. Remorse is always hard to measure but I think that no one feels worse than he does about the losses that friends, family and other clients/investors have experienced as a result of his participation in FKF3."  Ex. 16 (Roger Plotkin).

Together, these men lost more than $7 million in FKF3.  Their collective insight, as experienced investors and members of the community, is at least as meaningful as the views of investigators who have peered at the facts of this case through a retrospective lens.

Equally significant, additional former FKF3 noteholders continue to use Mitch as their accountant.[6]

---

[6]       In addition to Messrs. Plotkin, Garelick and Mandel, Bruce Terrin, Stephen Fromson, Stanley Levin and Daniel Napoli are still Mitch's clients.  At the time of FKF3's bankruptcy filing, Terrin was due $825,000, Fromson was due $100,000, Levin was due $86,148, and Napoli was due $175,000.

Next, and importantly, the Government has not charged a single person with fraud in connection with the business of FKF3. Magee, the person whom the Government has proffered committed wire fraud and securities fraud, Plea Hearing, Transcript at 20, 23-24 (stating "that the felony here of securities fraud, wire fraud or conspiracy to do the same alleged in the information was committed by . . . one of Mr. Klein's co-principals[, who] at one point took $500,000 that was issued in a cashier's check through JPMorgan Chase that was issued to him but intended for the fund and converted it to his own use. That co-principal did, in fact, have a fiduciary duty to the fund and to the investors in the fund and did not report it to any of the investors in the fund and converted it knowingly and willfully . . ."), and whose conduct forms the legal predicate for Mitch's plea, has not been charged. Dorfman pleaded guilty to violating 18 U.S.C. § 1001 for false statements to an investigator with the U.S. Department of Labor ("DOL") in connection with DOL's investigation of an investment made by his law firm's pension plan in FKF3. *See* Ex. 28 (Government's Sentencing Memorandum, at 2-3 (Dkt. No. 11), *United States v. Dorfman*, 16 Cr. 606 (CS) (S.D.N.Y.)) (Dorfman "falsely denied and failed to disclose his interests in FKF3" to the DOL investigator, because "[h]ad Dorfman disclosed the true relationship of the investments and FKF3 to the investigator, the DOL would have cited Dorfman for committing a prohibited transaction, forcing him to reverse the transfers and pay lost earnings."). The absence of any charges of fraud in the matter of FKF3 brings baseline context to the negotiated footnote.

Notably, in sentencing Dorfman, Judge Seibel did not take up the Government's suggestion to consider a scope of conduct broader than his Relevant Conduct. There, the Government stated as follows:

> Your Honor, the specific crime charged here is one that just kind of gives the tip of the iceberg of what happened here. Mr. Dorfman was engaged in significant self-dealing with

FKF 3 in which he was one of three members. And at first it seemed like a good idea.  It was a way of bringing in investment to lend out to various entities some of which Mr. Dorfman and his partners had interest in without telling that to the investors in FKF 3. But over time it went bad. The market went bad and these entities were unable to make their payments. But Mr. Dorfman and his partners tried to keep FKF running among other things by continuing to bring in money . . . There were fraudulent aspects of FKF 3 that I think there's no question about that. The single single biggest fraudulent aspect of FKF 3 is that FKF 3, the representatives who sold investors on investing in FKF 3, would say that FKF 3 had first line mortgage or first line liens and it did not. And the principals knew that because often they were on both sides of the transaction and they knew that, for example, other banks actually had mortgages and liens ahead of them.

Ex. 29 (Sentencing Hearing Transcript, at 4-6, *United States v. Dorfman*, 16 Cr. 606 (CS)

(S.D.N.Y.)).  Judge Siebel, in sentencing Mr. Dorfman principally to six months' imprisonment,

did not cite any aspect of this part of the government's sentencing comments as a factor

contributing to her sentence.  *See id*. at 21.[7]

### E.   A Sentence of Probation Would be Consistent With the Goal of Avoiding Unwarranted Sentencing Disparities

A non-custodial sentence in this case would also promote the avoidance of "unwarranted

sentencing disparities." 18 U.S.C. § 3553(a)(6).

In general, misprision cases are rare, and we are aware of no reported misprision sentence

in a case analogous to this one.  Misprision cases in which the "primary offender" has not been

charged, as here, are rarer still.  Courts may consider such a circumstance by way of mitigation.

*See United States v. Stewart*, 590 F.3d 93, 160-162 (2d Cir. 2009) (Calabresi, J., concurring)

---

[7]      In imposing a sentence substantially below the guidelines range of 18-24 months' imprisonment, the Court remarked as follows:  "… I cannot in good conscience impose the sentence that Mr. Lawrence has asked me for . . . [T]he **offense** is serious. The defendant lied about something that was serious. It was premeditated. It was uncorrected. It was uncorrected. He was **covering up his own illegal behavior which was enriching himself** at what turned out to be the expense of the employees and I understand he didn't intend that but he knew it was a risk. And the part that always amazes me when I sentence white collar defendants is that they do these things even though they were perfectly comfortable and just -- even though they were living well, they wanted to live better. To me this is not an offense where a sentence of time served is appropriate."  *Id*. at 21. (bold added).

(courts are permitted to find, under the "§ 3553 factors" that the "disparities between a defendant and other individuals who were not charged at all" can affect the "propriety of a sentence").

More generally, a non-custodial sentence would not be out of line with the sentences of other defendants who have pleaded guilty to misprision of felony where the underlying felony was fraud.  For example:

- John Radin pleaded guilty to an information charging him with misprision of felony relating to a scheme to commit "healthcare fraud involving a number of chiropractic clinics," one of which was owned, in part, by Radin.  Defendant's Sentencing Memorandum and Motion for Downward Departure, at 1 (Dkt. No. 17), *United States v. Radin*, 09 Cr. 384 (BBM) (N.D. Ga.).  The loss was between $400,000 and $1,000,000, Plea Agreement, at 5 (Dkt. No. 8), *United States v. Radin*, 09 Cr. 384 (BBM) (N.D. Ga.), and the PSR called for a sentence of 12-18 months.  Defendant's Sentencing Memorandum and Motion for Downward Departure, at 2 (Dkt. No. 17), *United States v. Radin*, 09 Cr. 384 (BBM) (N.D. Ga.).  Radin was sentenced to 4 years of probation, with the first "with the first 6 months to be spent on home confinement," and ordered to pay $170,765.80 in restitution.  Judgment, (Dkt. No. 19), *United States v. Radin*, 09 Cr. 384 (BBM) (N.D. Ga.).

- Anna Boling, who was indicted in nine counts of violations of 18 U.S.C. §§ 2, 78j(b), 78ff, 371, 1343, 1349, Indictment, (Dkt. No. 1), *United States v. Boling*, 06 Cr. 228 (ESH) (D.D.C.), pleaded guilty to an information charging her with misprision of felony in relation to her concealment of a "nationwide securities fraud scheme" that had "more than 50 victims" and caused losses that exceeded $400,000.  Government's Memorandum in aid of Sentencing, at 1 (Dkt. No. 199), *United States v. Boling*, 06 Cr. 228 (ESH) (D.D.C.).  Boling received a non-custodial sentence notwithstanding that (1) she had a guidelines range of 4-10 months, (2) "she recorded twenty-six (26) of the fraudulent voicemail messages that were disseminated throughout the country as part of the scheme," (3) "she knew that the 26 recordings that she recorded contained phony information and would be disseminated throughout the country," (4) "by October 2004, [she] became aware that the conduct of Mr. Boling[, her husband,] and Mr. Mills constituted securities fraud," (5) "[she] did not report the crime or any of the criminal participants to authorities," (6) "in an effort to avoid detection of the securities and wire fraud committed by her husband and others, as well as her own conduct, Ms. Boling falsely told her mother and sister that she did not do the voicemail recordings," (7) "at the time [she] made the statements to her sister and mother she believed that they would relay that false information to the Grand Jury in Washington, D.C.," and (8) her "mother and sister did, in fact, repeat these false declarations to the Grand Jury in Washington, D.C." *Id*. at 3.

**F.      Deterrence Not Will Be Materially Promoted by a Custodial Sentence**

In the circumstances of this case and this defendant, we respectfully submit that a non-custodial sentence would serve the purpose of specific deterrence.  The multi-year investigation culminating in this prosecution has visited deep and lasting strain on Mitch and his family.  *See* supra at 14.    There is accordingly also no realistic prospect of recidivism on Mitch's part.  This is especially so given Mitch's age, *see United States v. Ruiz*, 04 Cr. 1146 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."), his lack of any criminal history, his spotless record since committing the offense almost nine years ago, and his substantial familial obligations. *See United States v. Olis*, 2006 WL 2716048, 03 Cr. 217 (SL), at *13 (S.D. Tex. Sept. 22, 2006) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

Moreover, the letters submitted with this Memorandum from Mitch's family and friends provide insight into his good character, *see, e.g.*, Ex. 10 (Beth Heinle) ("If I were to describe Mitch I would say he is the most honest, generous man I have ever met."); Ex. 17 (Carol Rost) ("I feel qualified to say he is a genuine, compassionate and good man."); Ex. 23 (Jennifer and James Miller) ("Mitch is a man of honesty and integrity."); Ex. 11 (Keri Robitaille) ("He does and does without ever wanting in return."); Ex. 27 (Zelik and Robin Ziegelbaum) ("We respectively submit this letter to you Judge Karas and hope that it makes you better understand the nature of our closeness for Mitch Klein and the belief that Mitch Klein is a positive force in this world. He is a solid family member and a true friend to many."); *see also United States v.*

*Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant").  These letters and the PSR give every reason to conclude that Mitch will not re-offend.

A sentence of imprisonment is also unnecessary to further the objective of general deterrence.  The case itself is *sui generis*.  There is no reason to conclude that general deterrence will be affected one way or the other by the sentence.  *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (rejecting government's contention that affirming a probationary sentence imposed in criminal tax case would lessen deterrent value of criminal law "because it elevates one § 3553(a) factor – deterrence – above all others.  As § 3553(a) makes clear, the district court at sentencing must consider and balance a number of factors – not all of which will point in the same direction.").

## II.     REQUEST FOR SENTENCE OF PROBATION

For the foregoing reasons, we respectfully urge the court to follow the Probation Department's recommendation and sentence Mitch to time-served.

## III.    OBJECTIONS TO PSR

For the record, although we agree with the PSR's recommendation, *see* PSR at 20 ("We respectfully recommend that Your Honor impose a sentence of Time Served (1 day), followed by a one-year term of supervised release."), certain of our recommended comments to the draft PSR were not adopted in the final report.  Because the Report will be become a permanent part of the file in this case, we restate these objections.

A.      **The PSR's Presentation of "Offense Conduct" Contains Content That is Neither "Offense Conduct" nor "Relevant Conduct"**

There is a basic problem in the presentation of the "Offense Conduct" contained in Paragraphs 6 through 17, namely, much of it is not "offense conduct" as that term is used in the Guidelines.  It is not "Relevant Conduct" either.  Mitch entered a plea to a misprision of felony relating to Mitch's concealment of Magee's misappropriation of a $500,000.00 "cashier's check" that was due FKF3.  During the plea hearing, the Government described the conduct underlying the plea as follows:

> If this were to go to trial, the government would prove, among other things, that Mr. Klein was partners or co-principal with two others in an entity called FKF 3, LLC, which is a real estate investment fund that issued, among other things, notes to certain investors to repay them; and that one of Mr. Klein's co-principals at one point took $500,000 that was issued in a cashier's check through JPMorgan Chase that was issued to him but intended for the fund and converted it to his own use. That co-principal did, in fact, have a fiduciary duty to the fund and to the investors in the fund and did not report it to any of the investors in the fund and converted it knowingly and willfully, that Mr. Klein learned of that conversion, and after learning of it, he failed to notify any authorities of the conversion, and in conversations and other communications with clients of his who were also investors in the fund, he spoke in such a way as to conceal the fact that the money had been taken out of the fund and therefore was not available to, for example, help to repay these investors their investment in the fund.

Plea Hearing, Transcript at 23-24.  Accordingly, all of the information or allegations in Paragraphs 6 to 17 should be limited to information concerning the offense of conviction, and information and allegations that are not related to the offense of conviction should be stricken. This misplaced text is also not Relevant Conduct.

As further evidence that the PSR requires amendment, substantial parts of Paragraphs 6 through 17 mirror the discussion in Paragraph 80, which was copied, in substantial part, from a footnote in Mitch's plea agreement.  In that footnote, the Government acknowledges that the footnote does not describe "Relevant Conduct," ¶ 80 (noting that the parties agreed that the "Court may take into account" certain conduct described therein "even though the parties agree[]

that, other than the specific criminal acts charged in the Information, such actions do not constitute 'Relevant Conduct' as that term is defined in U.S.S.G. § 1B1.3."). The same alleged conduct cannot be described as "Offense Conduct" in Paragraphs 6 through 17. *See United States v. Anderson*, 15 F.3d 979, 981 n. 5 (10th Cir. 1994) ("'Offense conduct' has a narrower meaning than 'relevant conduct,' and is necessarily included within the definition of 'relevant conduct.'").

As a result, we propose again the following edits to the PSR:

- The third and fourth sentences of Paragraph 8 should be stricken because they are not related to Mitch's commission of misprision of felony. These two sentences are also duplicative substantively of text contained in Paragraph 80. *Compare* ¶ 8 ("Moreover, the money would be secured by sufficient collateral. FKF3 would receive first-in-line liens and mortgages on the properties to which they made loans so that should those properties experience financial problems, FKF3 would be able to dispense collateral out.") *with* ¶ 80 ("defendant will not contest that he and others acting in concert with him made misrepresentations to certain FKF3 note holders, namely, and in substance, that he and others acting at his direction represented that FKF3 had or would have first liens with respect to certain real estate projects to which FKF3 loaned money, even though the defendant knew that, with respect to such certain major loans, FKF3 did not have, or would not obtain such liens").

- Paragraph 10 should be stricken as it describes conduct that is unrelated to Mitch's commission of misprision of felony.

- Paragraph 11 should be stricken because it describes conduct (*e.g.*, the alleged receipt of undisclosed equity interests in real estate projects to which FKF3 lent money) that is unrelated to Mitch's commission of misprision of felony. The information in Paragraph 11 is also duplicative of information contained in Paragraph 80. *Compare* ¶ 11 ("KLEIN and others acting in concert with him, made misrepresentations to certain FKF3 note holders, namely, and in substance, that KLEIN and others acting at KLEIN's direction represented that FKF3 had or would have first liens with respect to certain real estate projects to which FKF3 loaned money, even though KLEIN knew that, with respect to such certain major loans, FKF3 did not have, or would not obtain, such liens.") *with* ¶ 80 ("The parties further agreed that, solely for the purposes of this case, the defendant will not contest that he and others acting in concert with him made misrepresentations to certain FKF3 note holders, namely, and in substance, that he and others acting at his direction represented that FKF3 had or would have first liens with respect to certain real estate projects to which FKF3 loaned money, even though the defendant knew that, with respect to such certain major loans, FKF3 did not have, or would not obtain such liens.").

-23-

- The second sentence of Paragraph 12 should be stricken because it describes conduct that is unrelated to Mitch's commission of misprision of felony.  The information in this sentence is also duplicative of information contained in Paragraph 80.  *Compare* ¶ 12 ("In doing so, KLEIN personally represented that (i) the money solicited from the Cleary family would be used to finance real estate projects, even though he knew that the money would instead be used to pay interest payments to existing FKF3 creditors; and (ii) that those loans were safe and none of FKF3's projects were in trouble, even though KLEIN knew that that representation was false.") *with* ¶ 80 ("The parties further agreed that, solely for the purposes of this case, the defendant will not contest that he personally represented that the money solicited from Victim 1 and Victim 2 would be used to finance real estate projects, even though he knew that the money would instead be used to pay interest payments to existing FKF3 creditors, and that those loans were safe and none of FKF3's projects were in trouble, even though the defendant knew that these representations were false.").

- Paragraph 14 should be stricken because it describes conduct that is unrelated to the misprision felony to which Mitch entered a plea.  The information in Paragraph 14 is also duplicative of information contained in Paragraph 80. *Compare* ¶ 14 ("Most of the investors in FKF3 lost most or all of their money..") *with* ¶ 80 ("The parties further agreed that individuals or entities who lost money in FKF3 may address the Court prior to or during sentencing as if they were victims entitled to address the Court pursuant to Federal Rule of Criminal Procedure 32(i)(4)(B) . . .").

### B.  The PSR Erroneously States That Mandatory Restitution Applies to the Offense of Conviction

Paragraph 18 of the PSR states that "[t]he provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense," and, in that vein, Paragraph 17 notes that Mitch is "responsible for restitution . . ."  That is not so.  Mandatory restitution does not apply to a violation of 18 U.S.C. § 4.  *See* 18 U.S.C. § 3663A.

Dated: June 11, 2018                             Respectfully submitted,
       New York, New York


                                                 PETRILLO KLEIN & BOXER LLP


                                                 By: /s/ *Guy Petrillo*

                                                 Guy Petrillo

(gpetrillo@pkbllp.com)

Daniel Goldman
(dgoldman@pkbllp.com)

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone:        (212) 370-0330
Telecopy:         (212)  370-0391